[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-14596

_____

D.C. Docket No. 1:13-cv-00312-WSD

JENNIFER CHAVEZ,

Plaintiff-Appellant,

versus

CREDIT NATION AUTO SALES, LLC,
f.k.a. Synergy Motor Company,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(January 14, 2016)

Before HULL and WILSON, Circuit Judges, and MARTINEZ,[*] District Judge.

PER CURIAM:

_____

[*] Honorable Jose E. Martinez, United States District Judge for the Southern District of
Florida, sitting by designation.

In this Title VII case, Jennifer Chavez appeals from the grant of summary judgment to her former employer, Credit Nation Auto Sales, LLC ("Credit Nation"). Chavez, an auto mechanic, filed this lawsuit for sex discrimination and alleges she was terminated because she is a transgender person.

Title VII declares unlawful any "employment practice" that "discriminate[s] against any individual with respect to . . . compensation terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII forbids intentional employment discrimination predicated on any of the protected characteristics of race, color, religion, sex, or national origin. See Denney v. City of Albany, 247 F.3d 1172, 1182 (11th Cir. 2001). Sex discrimination includes discrimination against a transgender person for gender nonconformity. Glenn v. Brumby, 663 F.3d 1312, 1316-17 (11th Cir. 2011).

Chavez's appeal may be distilled into three enumerations: that the district court erred in granting summary judgment by (1) deciding that she did not present direct evidence of discriminatory intent by Credit Nation in terminating her; (2) concluding that she did not establish a genuine issue of material fact regarding pretext pursuant to McDonnell Douglas to survive summary judgment on her sex discrimination claim; and (3) ruling that Chavez's circumstantial evidence did not create triable issues as to whether her employer Credit Nation had discriminatory

2

intent and whether that animus was "a motivating factor" in its terminating her. See 42 U.S.C. §§ 2000e-2(a)(1) and 2(m).  Upon review of the record, consideration of the parties' briefs, and after the benefit of oral argument, we affirm in part and reverse in part.

## I.    DIRECT EVIDENCE

In a Title VII case, a plaintiff may use either direct or indirect evidence to show that her employer discriminated against her because of her sex.  Direct evidence is evidence that proves the existence of a discriminatory motive to terminate without inference or presumption.  See Holland v. Gee, 677 F.3d 1047, 1054-55 (11th Cir. 2012); Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004).  Indirect evidence is circumstantial evidence.  Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1320 (11th Cir. 2012).  Chavez argues that she has shown Credit Nation's discriminatory intent by direct evidence.

Under our precedent, "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination."  Wilson, 376 F.3d at 1086 (quotation marks omitted).  "If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence."  Id.

3

None of Chavez's evidence satisfies the exacting standard of direct evidence of a gender-discriminatory motive.[1]  On November 24, 2009, Chavez met with James Torchia, President of Credit Nation, about her gender transition.  In support of her claim, Chavez relies primarily upon certain comments made by President Torchia during that meeting.

We conclude, however, that Torchia's comments are not the kind of "blatant remarks whose intent could mean nothing other than to discriminate" that we require to qualify as direct evidence.  Holland, 677 F.3d at 1055 (quotation marks omitted).  Alternatively, in the district court, Chavez failed to object to the magistrate judge's conclusion that she did not present any direct evidence.

Thus, we review Chavez's case as a circumstantial evidence case.  We outline the Title VII law about circumstantial evidence and then apply it to Chavez's evidence.

## II.    CIRCUMSTANTIAL EVIDENCE

"There is more than one way to show discriminatory intent using indirect or circumstantial evidence."  Hamilton, 680 F.3d at 1320.  "One way is through the

---

[1]We review de novo a summary judgment determination, viewing all evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor. Baloco v. Drummond Co., Inc., 767 F.3d 1229, 1246 (11th Cir. 2014).  Summary judgment is appropriately granted only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The non-moving party cannot survive summary judgment by presenting "[a] mere scintilla of evidence," but must present evidence from which a jury could reasonably find for the non-moving party.  Baloco, 767 F.3d at 1246.

burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973), and Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089 (1981)."  Id. (alterations added).

In Hamilton, this Court explained that another way is by "presenting circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  Id. (quoting Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011)) (quotation marks and alterations omitted).  "A triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents enough circumstantial evidence to raise a reasonable inference of intentional discrimination."  Id.  If the plaintiff presents enough such evidence, "her claim will survive summary judgment."  Id.

Similarly, in Lockheed-Martin, this Court emphasized that: "establishing the elements of the McDonnell Douglas framework is not, and never was intended to be, the sine qua non for a plaintiff to survive a summary judgment motion in an employment discrimination case."  644 F.3d at 1328.  "Rather, the plaintiff will always survive summary judgment if [she] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  Id.; see also Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (declaring that, in cases where a plaintiff cannot establish a prima facie case, summary judgment only

5

will be "appropriate where no other evidence of discrimination is present."
(emphasis removed)).

"[A] plaintiff may use 'non-comparison circumstantial evidence to raise a reasonable inference of intentional discrimination' and thereby create a triable issue." Chapter 7 Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1255 (11th Cir. 2012) (quoting Hamilton, 680 F.3d at 1320); see also Lockheed-Martin, 644 F.3d at 1328.   "Whatever form it takes, if the circumstantial evidence is sufficient to raise 'a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper.'" Chapter 7, 683 F.3d at 1256 (quoting Lockheed-Martin, 644 F.3d at 1328); accord Hamilton, 680 F.3d at 1320.

Here, Chavez attempts to travel on both circumstantial-evidence routes to a jury trial.  First, she claims her evidence is sufficient to create a genuine issue of material fact regarding pretext under the McDonnell Douglas framework.  Second, and alternatively, she argues her circumstantial evidence creates triable issues as to whether her employer Credit Nation had discriminatory intent and whether that animus was "a motivating factor" in its terminating her.  We review both routes.

## III.    McDONNELL DOUGLAS

### A.    Burden-Shifting Framework

In McDonnell Douglas, the Supreme Court announced a burden-shifting framework for Title VII cases based on circumstantial evidence.  Under this

6

framework, a plaintiff must first make out a prima facie case of intentional discrimination.  Wilson, 376 F.3d at 1087.[2]  The plaintiff's prima facie case gives rise to an inference or presumption of discrimination.  See id.  The burden then shifts to the defendant employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  Id.  This places upon the defendant merely an intermediate burden of production.  Turnes v. AmSouth Bank, 36 F.3d 1057, 1060 (11th Cir. 1994).

After the defendant has met its burden, the plaintiff bears the burden of showing that the employer's proffered reason "was not the true reason" for the employment decision and was merely pretext.  Jackson v. State of Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005).  If the plaintiff does not proffer sufficient evidence to create a genuine issue of fact as to pretext, the defendant employer is entitled to summary judgment.  See id.

If the plaintiff's evidence creates a fact issue as to pretext, the defendant employer may then attempt to prove that it would have made the same employment decision in the absence of the alleged bias or unlawful motive.

---

[2]To establish a prima facie case of employment discrimination under Title VII, a plaintiff must show (1) she is a member of a protected group; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) employment or disciplinary policies were differently applied to her.  Chapter 7, 683 F.3d at 1255 (11th Cir. 2012).  To be an adequate comparator, the preferentially treated individual from outside the plaintiff's protected class has to be similarly situated in all relevant aspects, yet disciplined in different ways for the same conduct.  Lockheed-Martin, 644 F.3d at 1326 n.17; Holifield, 115 F.3d 1555 at 1562.

The district court assumed without deciding that Chavez established a prima facie case of discrimination under the McDonnell Douglas framework. For purposes of this appeal, the parties do not dispute that Chavez established a prima facie case of sex discrimination, and Credit Nation articulated a legitimate, nondiscriminatory reason for Chavez's termination: Chavez was found sleeping on the job in a customer's car. Rather, the parties dispute whether Chavez's evidence is sufficient to create a jury issue as to pretext.

## B.    Pretext Prong

To establish pretext, an employee must specifically respond to the employer's explanation and produce sufficient evidence for a reasonable factfinder to conclude that the employer's stated reason is pretextual. See Combs v. Plantation Patterns, 106 F.3d 1519, 1529 (11th Cir. 1997) (explaining that the plaintiff must present "sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action"). A reason is not pretextual unless the employee shows both that the given reason was false and that discrimination was the real reason. Brooks v. Cty. Comm'n of Jefferson Cty., 446 F.3d 1160, 1163 (11th Cir. 2006). To survive summary judgment, the plaintiff must "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by

8

the employer were not the real reasons for the adverse employment decision."

Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc) (quoting

Combs, 106 F.3d at 1528).  The plaintiff must meet the employer's reason "head

on" and rebut it.  Wilson, 376 F.3d at 1088.

## C.    Chavez Failed to Show Pretext

Chavez's evidence failed to create a jury issue as to pretext.  Credit Nation

said that it fired Chavez, an auto mechanic, for sleeping while on the clock.  In

fact, Chavez slept for 40 minutes in a repair customer's vehicle while on the clock.

Chavez admitted to this conduct.  Credit Nation also fired another employee for

sleeping on the job.  Credit Nation's reason was both a true and legitimate reason.

Accordingly, the district court did not err in concluding that Chavez's

evidence failed to show that the reason given—sleeping on the job—was pretextual

under the McDonnell Douglas framework.[3]

## VI.    DISCRIMINATORY INTENT AND "A MOTIVATING FACTOR"

Even if she failed to show pretext, Chavez alternatively argues that she still

presented sufficient circumstantial evidence that Credit Nation had discriminatory

intent and that such intent was "a motivating factor" in her termination.  See 42

U.S.C. § 2000e-2(m).  Chavez asserts her termination was motivated not only by a

---

[3]Chavez also argues that her Seventh Amendment right to a jury trial was violated when the district court granted summary judgment to Credit Nation.  This argument wholly lacks merit.  See Zivojinovich v. Barner, 525 F.3d 1059, 1066 (11th Cir. 2008) (concluding that where summary judgment is appropriate, no Seventh Amendment violation occurs).

legitimate reason, but also by an impermissible reason, to wit bias against her transgender status. In this regard, we review (1) the causation standard of "a motivating factor" in § 2000e-2(m); (2) Credit Nation's arguments about § 2000e-2(m); and then (3) Chavez's evidence.

## A.    Section 2000e-2(m)—"A Motivating Factor" Causation

Prior to the enactment of § 2000e-2(m), if a plaintiff employee proved the defendant employer had discriminatory intent based on sex under § 2000e-2(a)(1), the defendant could avoid all liability by showing the defendant would have made the same decision to terminate the plaintiff in the absence of discriminatory motive. Price Waterhouse v. Hopkins, 490 U.S. 244-46, 258, 109 S. Ct. 1775, 1787-88 (1989). This "but for" causation allowed a defendant to avoid liability even if the plaintiff had shown discriminatory intent in the employment decision.

After Price Waterhouse, Congress passed the Civil Rights Act of 1991, which made the same-decision defense no longer a complete affirmative defense to liability in Title VII discrimination cases that are based on "race, color, religion, sex, or national origin." See Civil Rights Act of 1991, Pub. L. No. 102-166, § 107, 105 Stat. 1071, 1075-76 (codified at 42 U.S.C. §§ 2000e-2(m), 2000e-5(g)(2)(B) (2012)).

Importantly, if a plaintiff has evidence of discriminatory intent, § 2000e-2(m) now provides that Plaintiff Chavez may establish causation by showing

10

gender bias "was a motivating factor" in her termination, "even though other factors also motivated" her termination.  42 U.S.C. § 2000e-2.  The full text of § 2000e-2(m) provides:

> Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin <u>was a motivating factor</u> for any employment practice, <u>even though other factors also motivated the practice</u>.

42 U.S.C. § 2000e-2(m) (emphasis added).  Under § 2000e-2(m), Plaintiff Chavez may prevail if she proves that her sex was a "motivating factor" behind her termination, even if there were other, even legitimate, factors motivating that decision as well.  See <u>Harris v. Shelby Cty. Bd. of Educ.</u>, 99 F.3d 1078, 1084 (11th Cir. 1996).[4]

More recently, the Supreme Court has told us that "Section 2000e-2(m) is not itself a substantive bar on discrimination.  Rather, it is a rule that establishes <u>the causation standard</u> for proving a violation defined elsewhere in Title VII."  <u>Univ. of Tex. Sw. Med. Ctr. v. Nassar</u>, __ U.S. __, at __, 133 S. Ct. 2517, 2530 (2013) (emphasis added).  "[B]ut-for causation is not the test"; rather, "[i]t suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the

---

[4]In this regard, the 1991 Act as codified in § 2000e-2(m) legislatively overruled that part of the plurality's holding in <u>Price Waterhouse</u> which allowed defendants to completely avoid all liability upon proving that they would have taken the same employment action in the absence of discriminatory intent.  <u>Harris</u>, 99 F.3d at 1084 & n.4.

11

employer's decision." Id. at 2523.  The Supreme Court has also instructed that (1) the language of § 2000e-2(m) indicates Congress's intent to confine that provision's change to the listed five types of discrimination—"race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(m)—and (2) that § 2000e-2(m) does not apply to retaliation claims under § 2000e-3(a).  Id. at 2532-33; see also Lewis v. Young Men's Christian Ass'n, 208 F.3d 1303, 1304-05 (11th Cir. 2000) (indicating retaliation is not among the employment practices listed in § 2000e-2(m)).[5]

Further, the Supreme Court recently abrogated the requirement of direct evidence for § 2000e-2(m) cases.  Desert Palace, Inc. v. Costa, 539 U.S. 90, 92, 123 S. Ct. 2148, 2150 (2003).  The Supreme Court held that a plaintiff can rely on circumstantial evidence to show mixed motives under § 2000e-2(m).  Id. at 101, 123 S. Ct. at 2155.

This Court's own decision in Harris v. Shelby County Board of Education is instructive as to how § 2000e-2(m) applies.  In Harris, the plaintiff's lawsuit, brought under Title VII and § 1983, alleged the defendants discriminated against him by not selecting him as a school principal because of his race.  99 F.3d at 1080.  The Harris Court concluded (1) that the plaintiff presented sufficient

---

[5]This Title VII case involves only status-based discrimination based on sex, 42 U.S.C. § 2000e-2(a)(1).  Title VII also prohibits retaliating against an employee for reporting or opposing discrimination.  42 U.S.C. § 2000e-3(a).  Plaintiff Chavez has made no retaliation claims.

circumstantial evidence to create a jury issue on racially discriminatory intent in the hiring decision, but (2) that the defendant board proved it would have made the same hiring decision even in the absence of discriminatory intent.  Id. at 1084-85.  This Court affirmed the grant of summary judgment to the defendants on the plaintiff's § 1983 claim based on that same-decision, affirmative defense.  Id. at 1085.  But this Court remanded the Title VII claim to the district court to permit the plaintiff to prove race was "a motivating factor" behind the hiring decision, even though we found, based on overwhelming evidence, that the employer defendant would have made the same decision anyway.  Id. (citing § 2000e-2(m)).

The Harris Court also pointed out that on remand the remedy for a § 2000e-2(m) violation was limited by § 2000e-5(g)(2)(B).[6]  Id.  Specifically, if a defendant employer proves that it would have taken the same employment action in the absence of the illegal motivating factor, § 2000e-5(g)(2)(B) provides that the court "may grant" certain declaratory or injunctive relief and attorney's fees and costs

---

[6]The full text of § 2000e-5(g)(2)(B) provides:
> On a claim in which an individual proves a violation under section 2000e-2(m) of this title and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court--
> (i)    may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e-2(m) of this title; and
> (ii)   shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph (A).

42 U.S.C. § 2000e-5(g)(2)(B).

directly attributable to the pursuit of a § 2000e-2(m) claim, but "shall not award damages" or order "reinstatement."  42 U.S.C. § 2000e-5(g)(2)(B); see also Harris, 99 F.3d at 1085 (quoting 42 U.S.C. § 2000e-5(g)(2)(B)).  In § 2000e-2(m) cases, the employer's same-decision defense, if proven, effectuates only a limitation on liability, not a complete avoidance of it.  See Canup v. Chipman-Union, Inc., 123 F.3d 1440, 1442 (11th Cir. 1997).  However, if the defendant fails to carry this same-decision burden, the plaintiff prevails without the remedy limitation in § 2000e-5(g)(2)(A).

## B.    Credit Nation's Arguments

Despite the plain language in § 2000e-2(m) and our precedent, Credit Nation in effect argues that Chavez must still prove pretext to recover.  Credit Nation in essence asserts that if Chavez cannot show pretext, she cannot show mixed-motive causation under § 2000e-2(m).  That argument lacks merit because, as explained above, McDonnell Douglas is one route, but not the only available avenue in sex discrimination cases.  See Chapter 7, 683 F.3d at 1255; Lockheed-Martin, 644 F.3d at 1328; Hamilton, 680 F.3d at 1320; Harris, 99 F.3d at 1084-85.

We recognize this Court has indicated that if a retaliation claim fails at the summary judgment stage under McDonnell Douglas, it also fails under a "mixed-motive" analysis for the same reasons.  See Crawford v. City of Fairburn, 482 F.3d 1305, 1309 (11th Cir. 2007) (holding that because the plaintiff failed to show the

14

non-discriminatory reason for his termination "was pretextual" under <u>McDonnell Douglas</u>, "he has also failed to establish that the City [employer] was motivated by the consideration of an impermissible factor").  However, examined closely, <u>Crawford</u> involved <u>only a retaliation claim</u>, the Supreme Court has told us that § 2000e-2(m) does not apply to retaliation claims, and <u>Crawford</u> is thus not "a motivating factor" case under § 2000e-2(m) and is not applicable here.

Alternatively, Credit Nation argues that even if Chavez is not required to show pretext under <u>McDonnell Douglas</u>, she still failed to present sufficient circumstantial evidence for a reasonable jury to find that Credit Nation had any discriminatory intent or that her transgender status was "a motivating factor" in Credit Nation's termination of her employment.  We consider below whether Chavez met that burden.

**D.    Analysis of Chavez's Evidence**

Chavez worked as an auto mechanic at Credit Nation from June 18, 2008 to January 11, 2010.  She was never disciplined before she announced her gender transition on October 28, 2009.  Chavez was fired on January 11, 2010 for "[s]leeping while on the clock on company time."

President Torchia, Credit Nation's owner, was responsible for and made the decision to terminate Chavez.  There is some evidence Torchia was initially accommodating of Chavez's gender transition.  Torchia agreed to front Chavez an

15

additional week of unaccrued vacation time to allow Chavez additional time to recover after one of her gender transition surgeries.  And on November 9, 2009, Chavez wrote a letter to the Atlanta Journal Constitution that initially praised her employer's support for her gender transition.  Chavez's letter noted that her boss Torchia "was very supportive," that he said Chavez had "nothing to worry about," and that he "made sure that all employees understood the no-harassment policy."

But Chavez also presented plenty of circumstantial evidence suggesting that Torchia's attitude was not without reservation and that it changed.  First, as to discriminatory intent, on November 24, 2009, about a month after Chavez announced her plans to undergo a gender transition and several weeks after Chavez wrote her letter to the newspaper, Chavez met with Torchia to discuss the matter. Chavez reported that Torchia was "very nervous" about her gender transition and the "possible ramifications."  Torchia stated that "he did not want any problems created for [Chavez] or any of his other employees" due to Chavez's "condition." Torchia said it was Chavez's fault that Credit Nation had lost a tech applicant. Notably, Torchia added that he thought Chavez was going to "negatively impact his business."

After Chavez asked Torchia if it was "okay to talk about it" and to "educate others about [her] condition (transexualism) [sic] so they might understand and not

16

be afraid," Chavez reports that Torchia obliged but "only if [Chavez] was asked."[7] Torchia admonished that Chavez "shouldn't bring it up."

Also in this November 24 meeting, Torchia discussed what Chavez was allowed to wear to and from work. Even though Chavez changed into a uniform before her shift started and shortly before leaving work each day, Chavez reports that Torchia asked her "not to wear a dress back and forth to work." After Chavez told Torchia that she had not been wearing anything "outlandish" back and forth from work—"only . . . jeans and a top with tennis shorts"—Torchia said what Chavez had been wearing was acceptable, just so that she did not "wear a dress or miniskirt." Chavez asked about whether she could wear a dress to and from work once her gender transition was complete. Torchia said no. He said that "would be disruptive and any woman that wears a dress at the service department would be disruptive."

Also, on November 12, 2009, Vice President Cindy Weston told Chavez that Chavez needed to "tone it down," to not talk as much about her gender transition in the shop, and to be "very careful" because Torchia "didn't like" the implications of Chavez's planned gender transition. Weston admitted there was a problem with co-workers who were uncomfortable with Chavez's conversations about some of her upcoming surgeries. And after Chavez's termination, shop foreman Kirk

---

[7]Chavez memorialized in hand-written notes the content of her November 24 discussion with Torchia. We quote those notes here verbatim.

17

Nuhibian told Chavez, "i [sic] know for a fact you were run out of credit nation [sic]."

Chavez has also offered evidence suggesting Credit Nation subjected her to heightened scrutiny after learning about her gender transition plans and was simply looking for a legitimate work-related reason to terminate her. President Torchia told Chavez in their November 24 meeting, "I know you [Chavez] are the best mechanic here and I have heard that from everyone." And yet, even though Chavez was an excellent employee and had no prior disciplinary history, after disclosing her gender transition, Chavez soon found herself the subject of discipline.

As evidence of heightened scrutiny, Chavez points to an email exchange between Vice President Weston and attorney John McManus on which President Torchia was carbon copied. After Chavez complained that she had been told she could no longer use a unisex customer bathroom that other female employees were permitted to use, Weston solicited advice from attorney McManus, who responded. McManus wrote, "I am concerned that no matter what you do, that Employee is going to come up with come [sic] complaint." McManus suggested Credit Nation write up reports "indicating the issues about the restroom and how that was resolved," adding, "[t]omorrow will bring more issues and I think this will get to a breaking point before very long. Just have the management focus on work and

18

performance of required duties and the other issues should be written up one at a time." Chavez argues that a reasonable inference in her favor is that Credit Nation solicited its attorney for advice on how to find a legitimate work-related reason to terminate Chavez.

Chavez also points to a disciplinary write-up in mid-December that she alleges was gender-based. Several employees complained that Chavez was receiving special treatment in connection with her gender transition. After one of Chavez's co-workers, Richard Randall, complained that Chavez was receiving "special treatment" from Vice President Weston because Chavez was permitted to attend medical appointments related to her gender transition, Chavez warned Randall to stop harassing her and that Chavez had Weston's phone number.[8] Chavez was then written up as a result of this exchange.

Chavez also emphasized how Credit Nation's progressive disciplinary process was bypassed in her termination. Credit Nation's "Progressive Discipline" policy, outlined in Rule 716 of its handbook, lays out a four-step procedure for employee discipline. It states:

> Disciplinary action may call for any of four steps – verbal warning, suspension with or without pay, or termination of employment – depending on the severity of the problem and the number of

---

[8]While a Credit Nation employee reported that Chavez's exact words to Richard Randall were, "I have Cindy's Personal Cell Phone Number And No One Can Fuck With Me," Chavez testified that she did not recall phrasing her words this way. We must view material disputes in the light most favorable to the non-moving party.

19

occurrences.  There may be circumstances when one or more steps are bypassed.

While the handbook notes that "certain types of employee problems . . . are serious enough to justify . . . in extreme situations, termination of employment, without going through the usual progressive discipline steps," the handbook nonetheless clarified that "[p]rogressive discipline means that, with respect to most disciplinary problems, these steps will normally be followed."  It adds that "[t]he major purpose of any disciplinary action is to correct the problem, prevent recurrence, and prepare the employee for satisfactory service in the future."

Credit Nation's handbook also contains a "Disciplinary Procedures" policy, listed as Rule 717.  This policy explains that "corrective or disciplinary measures . . . are not intended to inflict punishment, but rather to correct whatever problems may exist and/or make employees aware of the importance of abiding by [Credit Nation's] policies, procedures and standards of conduct and behavior."  While this policy did list a number of employee behaviors that "may result in immediate discharge," "sleeping while on the clock on company time"—the reason Credit Nation provided in Chavez's termination notice—was not included in this list.

While Credit Nation's disciplinary policy gave it discretion in whether to follow each step progressively or to bypass "one or more steps" based on the circumstances, Chavez argues that her evidence at least creates the inference that Credit Nation deviated from the steps that were "normally to be followed."  None

20

of the progressive steps was followed prior to her termination.  Further, Credit Nation's argument that there was a legitimate reason to terminate Chavez—sleeping on the clock—misunderstands the plaintiff's burden under § 2000e-2(m). Again, Chavez need not show that the legitimate reason for her termination was pretextual, as she would under a <u>McDonnell Douglas</u> analysis.  Rather, it is enough that she show that discriminatory animus existed and was at least "a motivating factor."

Considering all the evidence put forth by Chavez and Credit Nation together and viewing it in the light most favorable to Chavez, we conclude triable issues of fact exist as to (1) her employer's discriminatory intent and (2) whether gender bias was "a motivating factor" in Credit Nation's terminating her.[9]

**AFFIRMED IN PART, REVERSED IN PART**.[10]

---

[9]Because the district court concluded that under § 2000e-2(m) Chavez failed to present sufficient evidence that her gender was "a motivating factor" in her termination, the district court's opinion did not address the "same-decision" issue under § 2000e-5(g)(2).  One sentence of Credit Nation's appellate brief summarily asserts that "Chavez has presented no evidence that suggests the decision to fire her because of her sleeping on the clock would have been different if she were not transgender."  We decline to address that issue raised on appeal in such a conclusory fashion.

[10]Credit Nation's motion requesting sanctions against Chavez is **DENIED**.

21

WILSON, Circuit Judge, concurring:

I concur in the result.